FILED

2022 Mar-29  PM 12:01
U.S. DISTRICT COURT
N.D. OF ALABAMA

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
MIDDLE DIVISION

| | | |
|---|---|---|
| STEVEN TATE, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| vs. | ) | Case No.   4:20-cv-01242-HNJ |
| | ) | |
| SOCIAL SECURITYADMINISTRATION, | ) | |
| COMMISSIONER, | ) | |
| | ) | |
| Defendant | ) | |

## MEMORANDUM OPINION

Plaintiff Steven Tate seeks judicial review pursuant to 42 U.S.C. § 405(g) of an adverse, final decision of the Commissioner of the Social Security Administration ("Commissioner"), regarding his claim for a period of disability and disability insurance benefits.   The undersigned carefully considered the record, and for the reasons expressed herein, **AFFIRMS** the Commissioner's decision.[1]

## LAW AND STANDARD OF REVIEW

To qualify for benefits, the claimant must be disabled as defined by the Social Security Act and the Regulations promulgated thereunder.   The Regulations define "disabled" as the "inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result

---

[1] In accordance with the provisions of 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73, the parties have voluntarily consented to have a United States Magistrate Judge conduct any and all proceedings, including the entry of final judgment. (Doc. 12).

in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a). To establish an entitlement to disability benefits, a claimant must provide evidence of a "physical or mental impairment" which "results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3).

In determining whether a claimant suffers a disability, the Commissioner, through an Administrative Law Judge (ALJ), works through a five-step sequential evaluation process. *See* 20 C.F.R. § 404.1520(a)(4). The burden rests upon the claimant at the first four steps of this five-step process; the Commissioner sustains the burden at step five, if the evaluation proceeds that far. *Washington v. Comm'r of Soc. Sec.*, 906 F.3d 1353, 1359 (11th Cir. 2018).

In the first step, the claimant cannot be currently engaged in substantial gainful activity. 20 C.F.R. § 404.1520(b). Second, the claimant must prove the impairment is "severe" in that it "significantly limits [the] physical or mental ability to do basic work activities . . . ." *Id.* at § 404.1520(c).

At step three, the evaluator must conclude the claimant is disabled if the impairments meet or medically equal one of the impairments listed at 20 C.F.R. Part 404, Subpart P, App. 1, §§ 1.00–114.02. *Id.* at § 404.1520(d). If a claimant's impairment meets the applicable criteria at this step, that claimant's impairment would

2

prevent any person from performing substantial gainful activity. 20 C.F.R. §§ 404.1520(a)(4)(iii), 404.1525. That is, a claimant who satisfies steps one and two qualifies automatically for disability benefits if the claimant suffers a listed impairment. *See Williams v. Astrue,* 416 F. App'x 861, 862 (11th Cir. 2011) ("If, at the third step, [the claimant] proves that [an] impairment or combination of impairments meets or equals a listed impairment, [the claimant] is automatically found disabled regardless of age, education, or work experience.") (citing 20 C.F.R. §§ 404.1520, 416.920; *Crayton v. Callahan*, 120 F.3d 1217, 1219 (11th Cir. 1997)).

If the claimant's impairment or combination of impairments does not meet or medically equal a listed impairment, the evaluation proceeds to the fourth step, where the claimant demonstrates an incapacity to meet the physical and mental demands of past relevant work. 20 C.F.R. § 404.1520(e). At this step, the evaluator must determine whether the claimant has the residual functional capacity ("RFC") to perform the requirements of past relevant work. *See id.* § 404.1520(a)(4)(iv). If the claimant's impairment or combination of impairments does not prevent performance of past relevant work, the evaluator will determine the claimant is not disabled. *See id.*

If the claimant succeeds at the preceding step, the fifth step shifts the burden to the Commissioner to provide evidence, considering the claimant's RFC, age, education and past work experience, that the claimant is capable of performing other work. 20 C.F.R. §§ 404.1512(b)(3), 404.1520(g). If the claimant can perform other work, the

evaluator will not find the claimant disabled.  *See id.* § 404.1520(a)(4)(v); *see also* 20 C.F.R. § 404.1520(g).  If the claimant cannot perform other work, the evaluator will find the claimant disabled.  20 C.F.R. §§ 404.1520(a)(4)(v), 404.1520(g).

The court reviews the ALJ's "'decision with deference to the factual findings and close scrutiny of the legal conclusions.'"  *Parks ex rel. D.P. v. Comm'r, Social Sec. Admin.*, 783 F.3d 847, 850 (11ᵗʰ Cir. 2015) (quoting *Cornelius v. Sullivan*, 936 F.2d 1143, 1145 (11ᵗʰ Cir. 1991)).  The court must determine whether substantial evidence supports the Commissioner's decision and whether the Commissioner applied the proper legal standards.  *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1178 (11ᵗʰ Cir. 2011). Although the court must "scrutinize the record as a whole . . . to determine if the decision reached is reasonable . . . and supported by substantial evidence," *Bloodsworth v. Heckler,* 703 F.2d 1233, 1239 (11ᵗʰ Cir. 1983) (citations omitted), the court "may not decide the facts anew, reweigh the evidence, or substitute [its] judgment" for that of the ALJ.  *Winschel*, 631 F.3d at 1178 (citations and internal quotation marks omitted). "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion."  *Id.* (citations omitted).  Nonetheless, substantial evidence exists even if the evidence preponderates against the Commissioner's decision.  *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11ᵗʰ Cir. 2005).

4

## FACTUAL AND PROCEDURAL HISTORY

Mr. Tate, age 55 at the time of the ALJ hearing, protectively filed an application for a period of disability and disability insurance benefits on August 17, 2017, alleging disability as of May 15, 2017.   (Tr. 131, 366).   The Commissioner denied Tate's claims, and Tate timely filed a request for an administrative hearing.   (Tr. 276, 301-02).   The Administrative Law Judge ("ALJ") held a hearing on August 14, 2019 (Tr. 127-72), and issued a partially favorable decision on November 9, 2019, finding Tate disabled as of May 15, 2019, but not disabled prior to that date.   (Tr. 13-25).

Applying the five-step sequential process, the ALJ found at step one that Tate did not engage in substantial gainful activity after his alleged onset date.   (Tr. 19).   At step two, the ALJ found Tate had the severe impairments of depression, neurocognitive disorders, anxiety, and stroke.   (*Id.*).   At step three, the ALJ found that Tate's impairments, or combination of impairments, did not meet or medically equal any impairment for presumptive disability listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.   (*Id.*).

Next, the ALJ found that Tate exhibited the residual functional capacity ("RFC")

to perform light work as defined in 20 CFR 404.1567(b) except occasionally climbing ramps or stairs, never climbing ladders, ropes or scaffolds, occasionally balancing, stooping, kneeling, crouching or crawling, must avoid frequent exposure to extreme cold, extreme heat, unprotected heights, unprotected moving mechanical parts and dangerous machinery, able to understand, remember and carry out simple instructions at a slowed pace but still able to maintain an acceptably

5

consistent work pace, frequent interaction with supervisors, co-workers and the general public, time off task can be accommodated by normal work breaks, may be absent up to 1 day per month.

(Tr. 20).

At step four, the ALJ determined Tate could not perform his past relevant work as a firefighter, paramedic, and heat and air installer helper.   (Tr. 23).   However, at step five, the ALJ determined that prior to May 15, 2019, Tate could perform a significant number of other jobs in the national economy considering his age, education, work experience, and RFC.   (*Id.*).   However, beginning on May 15, 2019, Tate's age category changed from an individual closely approaching advanced age to an individual of advanced age, and Medical-Vocational Rule 202.04 dictated that Tate could perform no jobs existing in significant numbers in the national economy.   (Tr. 23-25). Accordingly, the ALJ determined that Tate did not suffer a disability, as defined by the Social Security Act, prior to May 15, 2019, but he became disabled on that date and remained disabled through the date of the ALJ's decision, with an expectation that the disability would last 12 months past the onset date.   (Tr. 25).

Tate timely requested review of the ALJ's decision.   (Tr. 363-65).   On August 10, 2020, the Appeals Council denied review, which deems the ALJ's decision as the Commissioner's final decision.   (Tr. 1-4).   On August 24, 2020, Tate filed his complaint with the court seeking review of the ALJ's decision.   (Doc. 1).

**ANALYSIS**

In this appeal, Tate argues the ALJ improperly considered the opinions of treating providers Dr. June Nichols, Dr. Seth Spotnitz, and Dr. Michael Lyerly, and he reached a residual functional capacity finding that lacks substantial evidentiary support. For the reasons discussed below, although the undersigned may have rendered a different decision on another standard of review, the undersigned concludes those contentions do not warrant reversal under the substantial evidence standard.

## I.      The ALJ Properly Considered the Medical Opinions

Tate first argues the ALJ improperly considered the opinions of treating providers Dr. June Nichols, Dr. Seth Spotnitz, and Dr. Michael Lyerly.   On January 18, 2017, the Commissioner revised the regulations governing the assessment of medical opinion evidence for claims filed on or after March 27, 2017.   *See* Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844, 5867 (Jan. 18, 2017) (codified at 20 C.F.R. § 404.1520c).   Tate's claims, filed on August 17, 2017, fall under the revised regulations.

Pursuant to the revised regulations, the ALJ "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [the claimant's] medical sources."   20 C.F.R. § 404.1520c(a).   Rather, the ALJ must apply the same factors in

7

the consideration of all medical opinions and administrative medical findings, rather than affording specific evidentiary weight to any particular provider's opinion.   *Id.*

Supportability and consistency constitute the most important factors in any evaluation, and the ALJ must explain the consideration of those factors.   20 C.F.R. § 404.1520c(b)(2).   Thus, "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s)," and "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources[,] the more persuasive the medical opinions or prior administrative medical finding(s) will be."   20 C.F.R. § 404.1520c(c)(1)-(2).

The ALJ also may consider the medical source's specialty and the relationship between the claimant and the medical source, including the length, purpose, and extent of the treatment relationship, and the frequency of examinations.   20 C.F.R. § 404.1520c(c)(3)(i)-(iv).   The ALJ "may" conclude that an examining medical source will understand the claimant's impairments better than a medical source who only reviews evidence in the claimant's file.   20 C.F.R. § 404.1520c(c)(3)(v).   The ALJ also "will consider other factors that tend to support or contradict a medical opinion or prior administrative medical finding," including, but not limited to "evidence showing a medical source has familiarity with the other evidence in the claim or an understanding

8

of our disability program's policies and evidentiary requirements."   20 C.F.R. §
404.1520c(c)(5).

Tate argues that despite the regulatory revisions, the court still must follow
Eleventh Circuit case law requiring deference to a treating physician's opinion, absent
a showing of good cause to the contrary.   (Doc. 23, at 4-6; Doc. 24, at 1-9).   *See Phillips
v. Barnhart*, 357 F.3d 1232, 1240 (11th Cir. 2003) (citing *Lewis v. Callahan*, 125 F.3d 1436,
1440 (11th Cir. 1997)).   The Eleventh Circuit has not yet directly decided whether to
continue applying the treating physician rule after the regulatory revisions, but, in an
unpublished opinion, it indicated it would not do so.   *See Planas on behalf of A.P. v.
Comm'r of Soc. Sec.*, 842 F. App'x 495, 497 n. 1 (11th Cir. 2021) ("For claims filed on or
after March 27, 2017, however, the regulations limited the definition of 'medical
opinion' to a statement from a medical source about what the claimant can still do
despite the impairments and whether the claimant has one or more impairment-related
limitations or restrictions, and *no significant weight is given to statements made by treating
physicians as opposed to non-treating medical sources*.") (citing 20 C.F.R.   §§ 416.913(a)(2),
416.920c) (emphasis added).   Other judges within this district have consistently applied
the revised regulations, not the treating physician rule.   *See, e.g., Jenkins v. Social Security
Administration,* No. 4:20-CV-00995-LSC, 2022 WL 303305, at *4-6 (N.D. Ala. Feb. 1,
2022); *Cain v. Kijikazi,* No. 4:20-CV-924-CLM, 2022 WL 298119, at *3 (N.D. Ala. Jan.

31, 2022); *Glover v. Kijakazi,* No. 4:20-CV-1622-GMB, 2022 WL 256875, at *4 (N.D. Ala. Jan. 26, 2022).

The undersigned finds those decisions persuasive and consistent with Supreme Court authority granting an agency's interpretation of a statute "substantial deference . . . 'when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority.'" *Gonzales v. Oregon*, 546 U.S. 243, 255-56 (2006) (citing *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842-845 (1984); *United States v. Mead Corp.,* 533 U.S. 218, 226-227 (2001)).  "A court's prior judicial construction of a statute trumps an agency construction otherwise entitled to *Chevron* deference only if the prior court decision holds that its construction follows from the unambiguous terms of the statute and thus leaves no room for agency discretion." *Nat'l Cable & Telecommunications Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 982 (2005).

No authority discussing the Eleventh Circuit's treating physician rule indicates the rule derived directly from the language of the Social Security Act.  *See Cain,* 2022 WL 298119, at *3 (citing *Douglas v. Saul*, No. 4:20-cv-00822-CLM, 2021 WL 2188198, at *4 (N.D. Ala. May 28, 2021)) ("As this court has recently explained, nothing within the Social Security Act mandates the treating physician rule."); *Glover,* 2022 WL 256875, at *4 ("Glover has not directed the court to any decision in which the Eleventh Circuit

has held that the Social Security Act mandated the treating physician rule.").   To the contrary, the Social Security Act grants the agency "considerable authority" to issue interpreting regulations.   *Barnhart v. Walton*, 535 U.S. 212, 225 (2002); *see also* 42 U.S.C. § 405(a) ("The Commissioner of Social Security shall have full power and authority to make rules and regulations and to establish procedures, not inconsistent with the provisions of this subchapter, which are necessary or appropriate to carry out such provisions, and shall adopt reasonable and proper rules and regulations to regulate and provide for the nature and extent of the proofs and evidence and the method of taking and furnishing the same in order to establish the right to benefits hereunder.").   Tate has not asserted that the Social Security Administration lacked authority to implement the 2017 regulatory revisions, nor has he otherwise called into question the regulations' validity.[2]

---

[2] Tate cites several cases to persuade the court to continue applying the treating physician rule, but they all are distinguishable.   In *Simon v. Comm'r, Soc. Sec. Admin.*, 7 F.4th 1094, 1097 (11th Cir. 2021), *Delgado v. Comm'r of Soc. Sec.*, No. 20-14234, 2021 WL 4099237, at *5 (11th Cir. Sept. 9, 2021), *Shakeel v. Kijakazi*, No. 4:20-CV-01131-CLM, 2021 WL 5827206, at *2 (N.D. Ala. Dec. 8, 2021), and *Duncan v. Kijakazi*, No. 1:20-CV-90-JTA, 2021 WL 6125788, at *1 (M.D. Ala. Dec. 28, 2021), the claimants applied for Social Security benefits prior to the effective date of the new regulations.   In *Mayfield v. Comissioner, Soc. Sec. Administration,* No. 7:20-CV-01040-ACA, 2021 WL 5300925, at *4 (N.D. Ala. Nov. 15, 2021), and *Humber v. Comm'r of Soc. Sec.*, No. 2:20-CV-00501-JHE, 2021 WL 4409092, *6 n. 10 (N.D. Ala. Sept. 27, 2021), the courts declined to decide whether the treating physician rule continues to apply after the revised regulations because the ALJ erred under either standard.   In *Venable v. Kijakazi*, No. 4:20-CV-1741-AKK, 2021 WL 4894611, at *7 (N.D. Ala. Oct. 20, 2021), the court actually applied the revised regulations.   The decision in *Rose v. Saul*, No. 7:19-CV-91-BO, 2020 WL 4740479, at *3 (E.D.N.C. Aug. 14, 2020), concerned a VA disability rating, not a treating physician's opinion, and the district court proceeded under Fourth Circuit authority, not Eleventh Circuit authority.   Finally, in *Kathleen G. v. Comm'r of Soc. Sec.,* No. C20-461 RSM, 2020 WL 6581012 (W.D. Wash. Nov. 10, 2020), the district court considered the continued survival of the Ninth Circuit's "clear

The treating physician rule and the revised regulations cannot coexist, as the revised regulations explicitly state the ALJ should not defer to a treating source's opinion, or to the opinion of any other medical source.   20 C.F.R. § 404.1520c(a). Thus, as other judges within this district have done, the undersigned will apply the revised regulatory requirements, not the treating physician rule, when assessing the ALJ's consideration of the medical opinions in the record.

### A.   Substantial Evidence Supported the ALJ's Decision to Find Dr. Spotnitz's Opinion Unpersuasive

During a February 24, 2017, office visit, Tate informed Dr. Spotnitz, his treating neurologist, that he "was taken off the job yesterday and told he could not return unless he had a note from the office that he had not had a stroke."   (Tr. 706).   However, Tate reported feeling fine, other than a recent bout of flu.   His headaches had decreased, and he denied any acute visual changes, diplopia, speech disturbance, focal weakness, or sensory loss.   He did experience a chronic swallowing disturbance, but that condition had not changed.   He did not take any medications.

During the clinical examination, Tate displayed intact cranial nerves, full vision, asymmetric face, symmetric forehead, full strength, no drift, symmetric arm roll, intact motor movements, good reflexes, good sensation, normal gait, and normal finger-to-

---

and convincing" standard that "was based on evidentiary principles in administrative law, and not on a hierarchy of opinions."   *Id.* at *3.

nose movement.   Blood testing produced normal results.   Dr. Spotnitz did not discern any acute change in Tate's condition other than a mild left facial droop that did not appear to produce any additional deficits and would not prevent him from performing his job.  (Tr. 706-07).   Dr. Spotnitz stated:   "It is likely that [Tate] may not be able to continue with his job for much longer as this disease is progressive.   But, as of today, he is neurologically intact and able to meet the requirements of performing this position."  (Tr. 707).   Dr. Spotnitz ordered a brain MRI, neuro-psychiatric testing, and a follow-up appointment in three weeks.   (*Id.*).

During an April 6, 2017, follow-up visit, Tate stated he was doing "okay," though neuro-psychiatric testing recently revealed "significant degradation in his memory and intellectual functioning," and his recent MRI "showed new areas of sub-cortical stroke in both cerebral hemispheres."  (Tr. 705).   Tate's reported symptoms and neurological examination remained unchanged from his previous visit.   Dr. Spotnitz stated Tate's "neuro-psychiatric testing indicates that he is not intellectually capable of performing his current work and I have urged him to go out on sick leave and apply for disability." (*Id.*).   Dr. Spotnitz prescribed Botox, directed Tate to follow up in one month, and stated he "[w]ill take the patient out of work for medical reasons."  (*Id.*).[3]

---

[3] Based upon the record, the neuro-psychiatric testing referenced by Dr. Spotnitz corresponds to the tests performed by Dr. June Nichols, Psy.D., on March 6, 2017.   Notably, Dr. Nichols assessed Tate with average intellectual function and good judgment and insight.   (Tr. 654).   To be sure, Dr. Nichols found Tate suffered memory issues.   She administered the Weschler Memory Scales – Fourth Edition test, which revealed borderline auditory memory, average visual memory, borderline visual working

On May 15, 2017, Dr. Spotnitz completed a Report of Disability Statement of Examining Physician form for the Retirement Systems of Alabama.   He opined Tate was totally incapacitated from further performance of his duty, and from any other work, due to his neurological condition.   (Tr. 986-87).

The ALJ found Dr. Spotnitz's statements unpersuasive, as the doctor opined Tate was disabled, which constitutes a decision reserved to the Commissioner of Social Security.   In addition, Dr. Spotnitz's opinion that Tate could not perform "basic requirements of work due to his history of strokes with headaches [was] not supported by cited findings or consistent with the evidence of the longitudinal record that his symptoms are resolved up to 90% by receiving Botox shots."   (Tr. 22).   Tate challenges that finding by stating he summarized Dr. Spotnitz's treatment records, and by summarily asserting that all doctors' opinions in the record "are well supported by clinical and laboratory findings and not inconsistent with other substantial evidence." (Doc. 15, at 29; Doc. 23, at 6).

The ALJ rightfully refuted Dr. Spotnitz's statements about Tate's ability to work. As the Eleventh Circuit recently reiterated:

> An administrative law judge is not required to agree with the statement of a medical source that a claimant is "disabled" or "unable to work." 20 C.F.R. § 404.1527(d)(1).   Whether a claimant meets the

memory, borderline immediate memory, and low average delayed memory.   Tate also scored below average on subtests which assess logical memory, verbal paired associates, designs, visual reproduction, spatial addition, and symbol span.   (Tr. 655).   However, vis-à-vis Tate's cognitive functioning, Dr. Nichols diagnosed Tate with Mild Vascular Neurocognitive Disorder.   (Tr. 656).

statutory definition of disability is an administrative finding, not a medical opinion. That administrative finding is "reserved to the Commissioner." *Id.* § 404.1527(d). And because the Commissioner has delegated his authority to make the finding at the hearing level to an administrative law judge, the finding is effectively reserved to the administrative law judge. *See id.* § 404.1546(c). A medical source's opinion that a claimant is "disabled" or "unable to work" is not dispositive of a disability claim because the determination is reserved to administrative law judge acting on behalf of the Commissioner. *Id.* § 404.1527(d)(1).

*Walker v. Soc. Sec. Admin., Comm'r*, 987 F.3d 1333, 1338-39 (11th Cir. 2021).

Moreover, substantial evidence supports the ALJ's findings regarding the supportability and consistency of Dr. Spotnitz's opinions. As discussed, on February 24, 2017, Tate's headaches had decreased, and he exhibited normal clinical findings, other than a mild left facial droop that Dr. Spotnitz specifically stated would not interfere with his work. On April 6, 2017, though neuro-psychiatric testing had revealed memory and intellectual functioning deficits, the clinical examination remained unchanged.

Dr. Spotnitz's other treatment records during the approximate 12-month period surrounding his alleged onset date do not reflect any more serious symptoms, and the symptoms Tate did experience improved with medication. On June 1, 2016, Tate displayed no stroke-like symptoms, no visual changes, no focal weakness or sensory loss, and no hearing loss, tinnitus, or vertigo. He reported no anxiety, depression, panic attacks, or other psychiatric symptoms. He complained of migraines, but he

exhibited no seizures, tremors, numbness, dizziness, loss of balance, slurred speech, or stroke.   The neurological examination was normal.   Dr. Spotnitz had administered Botox injections for Tate's headaches, but the injections had not yet provided any relief. (Tr. 711-13).

On December 7, 2016, Tate reported improvement in his headaches, but he experienced some problems with depression, dizziness, and memory.   The clinical examination was normal.   (Tr. 708-09).

On June 23, 2017, Dr. Spotnitz stated Tate was doing well.   He reported crying easily, but his sleep and appetite had improved, and he displayed no visual, speech, or swallowing disturbances.   During the examination, Tate displayed intact cranial nerves, full strength, and normal gait.   (Tr. 700).

On August 17, 2017, Dr. Spotnitz again stated Tate was doing well.   Botox "much improved" his headaches, and other medications helped his stroke symptoms. During the examination, Tate presented as fully alert, with normal speech, intact comprehension, full strength, and normal gait.   (Tr. 693).

On September 20, 2017, Tate reported sleeping through Sunday School, then awakening, cursing at his wife, and being unable to speak or write.   He went to the emergency room, where he received a diagnosis of transient ischemic attack (TIA).   His symptoms resolved within 24 hours.   On the date of the appointment with Dr. Spotnitz, he felt fine.   The neurological examination was normal.   Dr. Spotnitz opined

16

Tate may have experienced a TIA or a seizure.   (Tr. 785-86; *see also* Tr. 781-82 (emergency room records)).

On November 22, 2017, Tate reported doing well.   He experienced no headaches, but he did experience three to four episodes of aphasia lasting an hour.   His examination revealed intact cranial nerves, full muscle strength, and normal gait.   Dr. Spotnitz recommended an MRI whenever Tate had insurance that would cover the test. (Tr. 783).

On April 20, 2018, Tate reported trouble with insomnia, snoring, and increased irritability.   The neurological examination was normal.   Dr. Spotnitz recommended a sleep study.   (Tr. 815-16).

On May 17, 2018, Tate continued to report excessive daytime sleepiness though he had received a C-Pap machine.   The neurological examination was normal.   Dr. Spotnitz reported Tate experienced no new stroke-like symptoms. (Tr. 809-10).

On June 25, 2018, Tate reported insomnia but no new neurological symptoms. Medication had improved his spontaneous crying spells and headaches, though he continued to experience one breakthrough headache each week.   The neurological examination was normal.   (Tr. 803-04).

These records provide substantial evidentiary support for the ALJ's finding that Tate experienced good improvement of his migraine symptoms with Botox.

Moreover, the consistently normal neurological examinations from September 2017 to June 2018 stand inconsistent with Dr. Spotnitz's assessment of disabling symptoms.

The other medical records support the ALJ's findings and do not reveal any more severe neurological symptoms.  On June 7, 2016, Tate reported sharp headache pain at a level one of ten, but medication had relieved the pain by 90%, as the ALJ noted. Tate's activities and mood had improved, and he characterized his current functional level as six out of ten.  The neurological examination revealed full orientation, intact cranial nerves, non-antalgic gait, normal sensation, and normal motor function.  (Tr. 680-82).

During visits to Carr Mental Wellness on December 5 and December 15, 2016, Tate reported no headaches or any other neurological or musculoskeletal symptoms. (Tr. 980-85).

The medical records, including those from Dr. Spotnitz, do reflect that Tate continued to experience some symptoms from his stroke disorder, but the ALJ accounted for those limitations by restricting Tate to occasionally climbing ramps and stairs; never climbing ladders, ropes, or scaffolds; occasionally balancing, stooping, kneeling, crouching, or crawling; and no frequent exposure to extreme cold or heat, unprotected heights, unprotected moving mechanical parts, or dangerous machinery. Due to Tate's neurocognitive disorder, depression, and anxiety, the ALJ limited Tate to understanding, remembering, and carrying out simple instructions at a slowed pace;

18

frequent interaction with co-workers, supervisors, and the general public; and work absences one day each month. (Tr. 22). Substantial evidence supports the ALJ's decision to adopt those limitations rather than Dr. Spotnitz's assessment of a complete inability to work.

### B.      Substantial Evidence Supports the ALJ's Decision to Find Dr. Lyerly's Opinion Unpersuasive

Dr. Lyerly, who treated Tate at the VA Medical Center's neurological clinic, provided a statement on August 6, 2019. He stated Tate suffered from Cerebral Autosomal Dominant Arteriopathy with Subcortical Infarcts and Leukoencephalopathy (CADASIL), which manifests in "recurrent subcortical strokes, cerebral microangiopathy, migraines, and cognitive dysfunction." (Tr. 1002). His most recent stroke occurred in 2017. Dr. Lyerly provided the following information regarding Tate's ongoing migraine headaches and cognitive limitations:

> Although the migraines themselves are clearly disabling, we will be continuing our efforts to better control these. He has mild left hemiparesis. Cognition seems to be worsening. He has previously had neuropsychological testing outside of the VA which sounds to have shown deficits in several cognitive domains. We will likely be repeating this here given his worsening. CADASIL affects the subcortical pathways in the brain that have to do with executive functioning and multimodal processing. Sematic fluency and visuospatial processing may also be impacted.
>
>          He is on medication (antiplatelet therapy) to reduce the risk of further stroke. There are no concerns with medication adherence. Unfortunately, there is no cure for this condition and CADASIL is progressive. He continues to have a high risk of recurrent stroke and will

19

continue to have neurological and cognitive impairment that will likely be progressive.

(Tr. 1002).

The ALJ found Dr. Lyerly's opinion unpersuasive, as the doctor's statement that Tate's migraine condition disabled him was "supported by cited findings but is wholly inconsistent with the longitudinal record of evidence indicating up to 90% relief with treatment."   (Tr. 23).   Other than stating that all doctors' opinions in the record "are well supported by clinical and laboratory findings and not inconsistent with other substantial evidence," Tate does not offer any substantive argument challenging the ALJ's consideration of Dr. Lyerly's opinion.   (Doc. 15, at 29; Doc. 23, at 6).

The ALJ properly considered the supportability and consistency of Dr. Lyerly's opinion pursuant to the revised regulations, *see* 20 C.F.R. § 404.1520c(b)(2), and substantial evidence supports his finding that the opinion was not consistent with the record as a whole.   As previously discussed, the record indicates Tate's condition substantially improved with treatment, and the ALJ accounted for the physical limitations Tate's stroke disorder imposed by restricting his residual functional capacity to less than a full range of light work.

Tate's VA treatment records do not support a different outcome.   Tate established care with the VA in April 2019, after he lost his health insurance.   (Tr. 918). On April 2, 2019, he reported migraine headaches, anxiety, depression, and past strokes.

He requested referrals to a neurologist and psychologist.   He displayed difficulty forming words and expressing himself, but the neurological examination was otherwise normal.   (Tr. 927-29).   During an April 10, 2019, neurological examination, he appeared depressed and anxious, but the results were otherwise normal.   (Tr. 921).

Thus, the ALJ properly considered Dr. Lyerly's assessment.

## C. Substantial Evidence Supports the ALJ's Decision to Find Dr. Nichols' Opinion Unpersuasive

June Nichols, Psy.D., treated Tate on February 16, 2017.   (Tr. 657).   She then provided a Mental Status Evaluation on March 6, 2017 (Tr. 653-56), and a Disability Determination Comprehensive Evaluation on December 6, 2017.   (Tr. 687-90).

On March 6, 2017, Tate reported problems with sleep, depressed mood, fatigue, feelings of losing control, binge eating, poor concentration, forgetfulness, and confusion.   He felt emotionally distant from other people, thought about hurting himself, and wished he were dead.   However, he did not plan to hurt himself because of his daughter.   He did not take any medications.

Since his last visit to Dr. Nichols prior to the March 6, 2017, appointment, Tate's employer sent him home because he had been slurring his words, but he returned the following day after providing a doctor's letter.   He reported problems with concentration and focus, including problems recalling information and finding words. He feared not being able to respond appropriately to work demands.

During the examination, Tate presented as neat and clean.   He maintained good eye contact, but he fought back tears.   He displayed dysthymic mood, congruent thought processes, depressed affect, problems sleeping, varied appetite, decreased energy, anhedonia, crying episodes, and suicidal thoughts without intent.   He displayed clear stream of consciousness, full orientation, normal thought processes, and normal conversation.   He experienced no auditory or visual hallucinations, no delusions, no ideas of reference, no response to an internal psychotic process, no obsessions or compulsions, and no panic attacks, but he had begun to withdraw from other people. He displayed good judgment and insight, and Dr. Nichols estimated average intellectual function.   Tate reported living with his ten-year-old daughter every other week and alone every other week.   He worked every third day, and he took care of everything in his home and outside.   He actively participated in church activities, but he did not participate in any other activities.   He had some good friends. (Tr. 653-55).

Dr. Nichols administered the Weschler Memory Scales – Fourth Edition test, which revealed borderline auditory memory, average visual memory, borderline visual working memory, borderline immediate memory, and low average delayed memory. Tate also scored below average on subtests which assess logical memory, verbal paired associates, designs, visual reproduction, spatial addition, and symbol span.   (Tr. 655).

Dr. Nichols diagnosed Tate with Major Depressive Disorder, Single Episode, Severe, Adjustment Disorder with Anxiety, and Mild Vascular Neurocognitive

Disorder.  (Tr. 656).  She characterized Tate's prognosis for improvement over the

next 12 months as poor:

> Mr. Tate is "feeling" these changes and has lost confidence in his ability to provide emergency care to those persons that he encounters daily.  He is suffering with symptoms of depression that are severe and voiced suicidal ideation.   His situation is complicated by the fact that his department provides no options for medical retirement.   He has over 16 years with his department, but retirement requires 20 years.   There is no "light duty" or non-first responder position that he could have the option to transfer to.   He has lost confidence in his coworkers after having been sent home without anyone talking with him one-on-one and instead he was sent to see the Chief.   He may quickly become unable to handle the pressures of his daily work requirements, he is already in a position where he could make a serious mistake.   He does have deficits, which could interfere with his ability to perform at his best.

(*Id.*).

On December 6, 2017, Dr. Nichols evaluated Tate again at the request of

Disability Determination Services.   Tate reported Dr. Spotnitz "wrote him out of work

and told him that he did not need to go back after his last evaluation and meeting."

(Tr. 687).   Tate had never received mental health counseling or suffered a

hospitalization for mental health issues.   He reported his medications helped his

symptoms, but he could not afford the medications.   He experienced bursts of

emotions, declining memory, and aphasia.   (*Id.*).

During the clinical examination, Tate again presented as neat and clean, with fair

eye contact, clear speech but frequent swallowing, dysthymic but congruent mood, and

tearful affect.   He reported sleep problems, varied appetite and energy, spontaneous

23

crying episodes, and no suicidal or homicidal ideation.  He displayed clear stream of consciousness, full orientation, normal thought processes, some confusion and tangentiality, rapid conversation, and some evidence of aphasia, but no hallucinations, delusions, ideas of reference, internal psychotic processes, obsessions, compulsions, or panic attacks.   Dr. Nichols assessed good judgment and insight and average intelligence.  (Tr. 688).

Tate reported living with his wife and two stepchildren, and his daughter joined the household every other week.  He takes his daughter to school, watches his two-year-old stepson, loads ammunition, goes to the shooting range two to four times a week, does housework, and reads.  His wife helps with household responsibilities. His sleep schedule varies, but he eats three meals a day.  He participates heavily in church activities, but he does not participate in other social or community activities. He has multiple friends.

Dr. Nichols again administered memory testing.   Tate's auditory memory, visual memory, and immediate memory increased slightly from the March evaluation.   His visual working memory decreased slightly, and his delayed memory remained the same. His subtest scores either remained consistent with the previous results, or they fluctuated by only one or two points.   (Tr. 689).

Dr. Nichols diagnosed Tate with Depressive Disorder due to his Medical Condition with Major Depressive Features, Severe, and Mild Vascular Neurocognitive

Disorder.   She described his prognosis for significant improvement over the next 12 months as poor "as the changes with memory would not be expected to demonstrate any improvement."  (Tr. 690).   In conclusion, she stated:

> The medical evidence of record provided by DDS was reviewed and those findings were considered in the overall assessment of the patient.  He would be able to understand instructions, but might not remember them to carry them out.   He is unable to sustain concentration and persist in a work relate[d] activity at a reasonable pace.   He is likely unable to maintain effective social interaction on a consistent and independent basis with supervisors, coworkers, and the public.   He is likely unable to deal with normal pressures in a competitive work setting. He is likely able to manage his own funds.

(*Id.*).

The ALJ found Dr. Nichols' assessment unpersuasive.   He characterized her findings about Tate's ability to understand and remember instructions, respond to work pressures, and maintain effective social interaction as "unsupported by her cited findings such as where she noted the claimant demonstrated good judgment and insight and is inconsistent with the evidence of the longitudinal record including the claimant's activities of daily life." (Tr. 22).   Other than stating that all doctors' opinions in the record "are well supported by clinical and laboratory findings and not inconsistent with other substantial evidence," Tate does not offer any substantive argument challenging the ALJ's consideration of Dr. Nichols' opinion.   (Doc. 15, at 29; Doc. 23, at 6).

As with the other medical opinions, substantial evidence supports the ALJ's evaluation of the supportability and consistency of Dr. Nichols' opinion pursuant to

25

the revised regulations.   *See* 20 C.F.R. § 404.1520c(b)(2).   Moreover, the court notes that the results of Dr. Nichols' memory testing do support the limitations she imposed on Tate's ability to understand and remember instructions.   However, the court must assess not whether some evidence supports the doctor's opinions, but whether substantial evidence supports the ALJ's decision to find the opinions unpersuasive. *Moore*, 405 F.3d at 1213 (quoting *Bloodsworth,* 703 F.2d at 1239) ("To the extent that Moore points to other evidence which would undermine the ALJ's RFC determination, her contentions misinterpret the narrowly circumscribed nature of our appellate review, which precludes us from 're-weigh[ing] the evidence or substitut[ing] our judgment for that [of the Commissioner] . . . even if the evidence preponderates against' the decision.") (alterations in original).

Substantial evidence supports the ALJ's finding that Dr. Nichols' opinion was unpersuasive.   As the ALJ observed, Dr. Nichols found Tate demonstrated good judgment and insight.   She also found Tate displayed clear stream of consciousness, full orientation, and normal thought processes, but no hallucinations, delusions, ideas of reference, internal psychotic processes, obsessions, compulsions, or panic attacks. Moreover, Dr. Nichols documented varied daily activities including caring for children, performing housework, participating heavily in church activities, and interacting with multiple friends.   Those activities provide substantial evidentiary support for the ALJ's

decision to reject Dr. Nichols' assessments of an inability to maintain social interaction and respond to work pressures.

Other records do not depict a more serious mental health condition.  Tate's medical treatment records, as described above, do not reflect disabling mental limitations.    Nor do Tate's limited mental health treatment records.

During a December 5, 2016, visit to Carr Mental Wellness, Tate reported memory problems, sleep problems, loss of interest in regular activities, and past (but no current) suicidal ideations.  He changed his medications after experiencing suicidal ideations in the past.   He reported enjoying playing in a church band and shooting his gun.  During the examination, Tate displayed cooperation, fidgeting, normal speech, anxious but happy mood, tangential thought process, thoughts of not waking up, no homicidal or psychotic thoughts, mildly impaired cognition, adequate fund of knowledge, easy distractibility, fair insight, and fair judgment.  The nurse practitioner assessed persistent mood disorder, mild cognitive impairment, and unspecified anxiety disorder, and she prescribed medication for depression and focus.  (Tr. 983-85).

During a December 15, 2016, psychotherapy session at Carr Mental Wellness, Tate reported no improvement in his condition despite taking his medication as prescribed.  During the examination, he displayed cooperation, normal psychomotor activity, normal speech, happy mood, congruent affect, normal thought processes, no suicidal or homicidal thoughts, no psychotic thoughts, intact cognition, average fund of

knowledge, easy distractibility, and good judgment and insight.   He received supportive psychotherapy and new medication for insomnia. (Tr. 980-82).

During an April 10, 2019, visit to the VA, Tate denied suicidal or homicidal ideation, auditory or visual hallucinations, and alcohol or drug abuse.   He reported sad mood, insomnia, fatigue, uncontrolled crying spells, palpitations, fear of dying, and fear of going crazy.   (Tr. 918-19).   During a mental status examination, he demonstrated appropriate appearance, appropriate grooming, good eye contact, normal speech, appropriate behavior, depressed and anxious mood, appropriate affect, alert attention span, fair concentration, full orientation, normal thought content, coherent thought processes, adequate insight, and fair judgment.   (Tr. 921).   Dr. Jamil adjusted Tate's medications and referred him to psychotherapy.   (Tr. 922).

Like the records of Tate's physical condition, Tate's mental health records reflect that he experienced some mental health symptoms, but the ALJ accounted for those limitations by restricting Tate to understanding, remembering, and carrying out simple instructions at a slowed pace; frequent interaction with supervisors, co-workers, and the general public; and absenteeism one day per month.   (Tr. 22).   Substantial evidence supports the ALJ's decision to adopt those limitations rather than Dr. Nichols' assessment of more completely disabling symptoms.

Although the court may have assessed the foregoing medical opinions differently upon a more demanding standard or if placed in the ALJ's shoes, the court "may not

decide the facts anew, reweigh the evidence, or substitute [its] judgment" for that of the ALJ. *Winschel*, 631 F.3d at 1178 (citations and internal quotation marks omitted). "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion," *id.* (citations omitted), and the Commissioner satisfied that standard in this case because its "threshold for such evidentiary sufficiency is not high." *Biestek v. Berryhill*, __ U.S. __, 139 S. Ct. 1148, 1154 (2019) (citations internal quotations omitted).

## II.   The ALJ Properly Assessed Tate's Residual Functional Capacity to Perform Light Work

As previously discussed, at step four of the sequential analysis the ALJ formulates a claimant's RFC by assessing his or her "ability to meet the physical, mental, sensory, and other requirements of work." 20 C.F.R. § 404.1545(a)(4). The claimant's RFC represents "the most [he or she] can still do despite [their] limitations." 20 C.F.R. § 404.1545(a)(1). Assessing a claimant's RFC lies within the exclusive province of the ALJ. *See* 20 C.F.R. § 404.1527(d)(2) ("[T]he final responsibility for deciding [a claimant's RFC] is reserved to the Commissioner."); 20 C.F.R. § 404.1546(c) ("[T]he administrative law judge . . . is responsible for assessing [a claimant's] residual functional capacity."); *Oates v. Berryhill*, No. 17-0130-MU, 2018 WL 1579475, at *8 (S.D. Ala. Mar. 30, 2018) ("The responsibility for making the residual functional capacity determination rests with the ALJ."); *Del Rio v. Berryhill*, No. 3:16-CV-00489-RFC, 2017

29

WL 2656273, at *8 (W.D. Tex. June 20, 2017) ("The ALJ has the sole responsibility of determining Plaintiff's RFC . . . .").

Though not entirely clear from Tate's brief, he may argue the ALJ's RFC finding cannot enjoy substantial evidentiary support because the ALJ found unpersuasive the assessments by Dr. Nihcols, Dr. Spotnitz, and Dr. Lyerly.   To the extent Tate asserts the ALJ did not rely upon a formal functional assessment by a treating or examining physician, relevant authority clearly establishes the responsibility for conducting an RFC analysis rests with the ALJ, not with any medical provider.   *See* 20 C.F.R. § 404.1527(d) (stating that RFC and disability determinations constitute "issues reserved to the Commissioner"); *Beegle v. Soc. Sec. Admin., Com'r*, 482 F. App'x 483, 486 (11th Cir. 2012) (citing 20 C.F.R. §§ 404.1527(d)) ("A claimant's residual functional capacity is a matter reserved for the ALJ's determination, and while a physician's opinion on the matter will be considered, it is not dispositive.").

Tate also argues the ALJ based his RFC finding on a hypothetical question to the vocational expert that did not include all of his limitations.   "'In order for a vocational expert's testimony to constitute substantial evidence, the ALJ must pose a hypothetical question which comprises all of the claimant's impairments.'"   *Forrester v. Comm'r of Soc. Sec.*, 455 F. App'x 899, 903 (11th Cir. 2012) (quoting *Wilson v. Barnhart*, 284 F.3d 1219, 1227 (11th Cir. 2002) (per curiam)).   However, "'the ALJ is not required to include findings in the hypothetical that the ALJ has found to be unsupported.'"   *Id.* (quoting

*Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1161 (11th Cir. 2004)).

The ALJ's hypothetical question to the vocational expert mirrored his residual functional capacity finding.   (TR. 20, 167-68).   Tate does not specify any other limitations the ALJ should have added to the hypothetical question, and as discussed, the ALJ did not have to include limitations he deemed unsupported.   The court cannot discern from the record any limitations the ALJ could have included that would change the disability finding, other than those limitations he properly considered unsupported. Accordingly, the court concludes the ALJ included all of Tate's impairments in the hypothetical question to the vocational expert, and he properly relied on the vocational expert's testimony.

Therefore, the court finds the ALJ properly assessed Tate's residual functional capacity, and substantial evidence supports the ALJ's decision.   The ALJ did not err.

### CONCLUSION

For the foregoing reasons, the court **AFFIRMS** the Commissioner's decision. The court will enter a separate final judgment.

**DONE** this 29th day of March, 2022.

_____
HERMAN N. JOHNSON, JR.
UNITED STATES MAGISTRATE JUDGE